# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 03-2026

ANTHONY D. BUIE,

*Plaintiff-Appellant,*

v.

QUAD/GRAPHICS, INC.,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 01 C 646—**Rudolph T. Randa**, *Chief Judge.*

_____

ARGUED FEBRUARY 13, 2004—DECIDED APRIL 27, 2004

_____

Before FLAUM, *Chief Judge*, and MANION and DIANE P. WOOD, *Circuit Judges.*

MANION, *Circuit Judge.* Anthony D. Buie is a black man with AIDS. He alleged that Quad/Graphics, Incorporated committed (1) racial discrimination in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.;* (2) sexual discrimination in violation of Title VII; (3) disability discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.;* and (4) retaliation under the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601, *et seq.* The district court entered summary judgment in Quad/Graphics' favor as to all claims. On appeal, Buie

abandons his theories of racial and sexual discrimination but maintains that he was entitled to reach a jury with his claims under the ADA and FMLA. We affirm.

## I.

Because this appeal comes to us after summary judgment in favor of Quad/Graphics, we review the record in the light most favorable to Buie. *E.g.*, *Rogers v. City of Chicago*, 320 F.3d 748, 750 (7th Cir. 2003). From November 28, 1997 through December 1, 1999, Buie worked in the finishing department at Quad/Graphics, which produces printed materials. Buie's supervisors warned him about frequent absenteeism three times between March 1998 and September 9, 1999. When providing the latest warning to Buie, Buie's supervisor, Scott Connell, wrote that "[i]f Anthony continues to have attendance problems he may be termed [sic] from Quad Graphics." Buie was nonetheless absent without excuse and without notice again on September 24 and October 10, 1999.

On October 15, 1999, Buie called Connell on the telephone—after his shift had already begun—and told him that he was sick and would not work that day. Connell responded by saying that Buie's job was in jeopardy. Buie then said that he had AIDS and that his absenteeism was because of the syndrome. This was the first time Quad/Graphics knew of Buie's condition. After Connell learned that Buie had AIDS, he told Buie (either on October 15 or October 17; Buie's affidavit provides both dates) not to return to work.[1]

---

[1] The district court concluded that no competent evidence showed that, before October 21, Buie was told not to return to work. For reasons discussed below, we conclude that the record,

(continued...)

On October 21, 1999, at the instruction of Steve Kirk, the finishing department manager, Buie met with Caroline Vrabel, Quad/Graphics' corporate employee services manager. Vrabel told Buie that he could apply for FMLA leave for some of the absences when he had called in sick. She further told him not to report to work until he had completed the FMLA application and his attendance issue was resolved. Buie complied with Vrabel's directions. Only after Buie returned to work, however, did Frank Arndorfer, vice president of finishing operations, decide that his leave would be considered a disciplinary suspension for excessive absenteeism. Buie was unaware of that designation when he first left work.

Buie met with Vrabel and Arndorfer on November 10, 1999. Vrabel told Buie that she had excused many of his absences and requested that short-term disability benefits be paid to him for those absences. But Vrabel also stated that she had calculated that he still had accumulated 14 absences during the preceding 11 months that could not be excused, including six no-call, no-show absences. On November 16, 1999, Buie met again with Vrabel and Arndorfer. Arndorfer presented him with a last chance agreement and offered him the choice between signing the agreement or being fired immediately. The agreement, which Buie signed, stated that Buie could be fired for any violation of the employee services manual or the agreement itself. Buie then returned to work, but the peace was short-lived.

On November 29, 1999, Buie had a confrontation with a superior, Harold Bridges, while the two were working on a conveyor belt. According to Bridges (who is black), after he

---

(...continued)
construed in the light most favorable to Buie, shows that Connell told him either on October 15 or 17 not to come back to work.

upbraided Buie for falling behind in his work, Buie treated Bridges to an outburst about how Buie would work on the conveyor belt when he pleased and how Bridges and other black employees did not know how to "get over on these white mother------s." Bridges admitted that he replied by saying that "niggas [sic] always want something for nothing" and stated that Buie reacted to this remark by pushing bundles of publications off of the conveyor belt and refusing Bridges' order to return to work.

Connell soon learned of, and investigated, the incident. Several employees confirmed Bridges' version of events. Connell also asked for Buie's side of the story. Buie denied telling Bridges that he would work when he pleased, pushing publications off of the conveyor belt, and making the racist statement that Bridges attributed to him. Buie further explained he would not return to work under Bridges because of Bridges' own use of a racial slur. After considering the evidence, Connell issued a written warning to Buie.

Buie, for his part, did not let matters rest there. He knew that one of the employees who had corroborated Bridges' account was Diane Grignon and, on December 1, 1999, he confronted her. As Grignon soon told Connell, Buie pointed his finger at her and said, at a range where Grignon could feel Buie's spittle on her face, "I'll get you, bitch." As Grignon recounted, when she asked him whether that was a threat, Buie replied that it was and asked where her witnesses were. The confrontation ended with Grignon pushing Buie's finger from her face as Connell approached.

Later that day, Connell learned that the house mother of the halfway house in which Grignon resided had received a call from a man identifying himself as "Anthony." The caller said that if "something happens to [Grignon] on the bus tonight, it's her own fault." At that point, Connell, Kirk, and Arndorfer decided to fire Buie, whom they discharged

the next day (December 2) through a letter signed by Arndorfer. Grignon was disciplined for her part in the incident, but not fired.

Buie's work-related troubles did not end with his discharge. He later was found guilty in the State of Wisconsin Circuit Court of Waukesha County for disorderly conduct as a result of his confrontation with Grignon. The state court found that the prosecution

> met its burden of proof establishing that this defendant was profane and otherwise disorderly—or otherwise disorderly. I would point to him getting within six inches of Ms. Grignon, putting his finger in her face so close and speaking in such a way and so close that the spitle [sic] would go across to her and making threatening remarks. This is all under circumstances tending to cause or provoke an immediate disturbance of public order.

Buie sued Quad/Graphics in the district court, alleging four claims: (1) racial discrimination in violation of § 1981 and Title VII; (2) sexual discrimination in violation of Title VII; (3) disability discrimination under the ADA; and (4) FMLA retaliation. The district court entered summary judgment in Quad/Graphics' favor, disregarding several parts of Buie's affidavit in the process. On appeal, Buie abandons his claims of racial and sexual discrimination but maintains that he was entitled to reach a jury with his claims under the ADA and FMLA.

## II.

We review the district court's grant of summary judgment de novo, construing all facts in favor of Buie, the nonmoving party. *Rogers*, 320 F.3d at 752. Summary judgment is appropriate when the "pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In short, summary judgment is warranted where "a rational trier of fact could not find for the non-moving party." *Rogers*, 320 F.3d at 752.

The ADA forbids certain employers from "discriminat-[ing] against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (2000). It is undisputed that Quad/Graphics is an employer covered by the ADA and that Buie is an "individual with a disability" for purposes of the statute.[2] To prove that he suffered disability discrimination under the ADA, Buie may proceed under the direct or indirect methods. *Robin v. Espo Engineering Corp.*, 200 F.3d 1081, 1089 (7th Cir. 2000). There are two types of permissible evidence under the direct method: direct evidence and circumstantial evidence. *Rogers*, 320 F.3d at 753. The former "essentially requires an admission by the decision-maker that his actions

---

[2] Buie argues that he has the ADA's protections because Quad/Graphics regarded him as disabled, but that he "has not presented proof that he is actually disabled." The undisputed evidence, however, shows that Buie had AIDS when he was suspended and fired, which means that he was disabled for purposes of the ADA. *See Doe v. Mutual of Omaha Ins., Co.*, 179 F.3d 557, 558 (7th Cir. 1999). Regardless of whether we were to construe Buie as someone actually disabled by AIDS, or merely as someone whom Quad/Graphics regarded as being disabled by AIDS, he would still be within the statute's protection. *See, e.g., Mack v. Great Dane Trailers*, 308 F.3d 776, 780 (7th Cir. 2002).

were based upon the prohibited animus." *Id.* The latter is evidence that "allows a jury to infer intentional discrimination by the decision-maker." *Id.*

Buie may also proceed under the indirect method, which first requires him to establish a prima facie case of discrimination. To do so, Buie must show that (1) he is disabled under the ADA; (2) he is qualified to perform the essential functions of his job with or without reasonable accommodation; and (3) he has suffered from an adverse employment decision because of the disability. *Dvorak v. Mostardi Platt Assoc., Inc.*, 289 F.3d 479, 483 (7th Cir. 2002). Were Buie to put forth a prima facie case, the burden would then shift to Quad/Graphics to articulate a nondiscriminatory reason for each adverse employment action. *Id.* at 485. If Quad/Graphics were to meet its burden, Buie would then have to prove by a preponderance of the evidence that Quad/Graphics' proffered reasons were a pretext for intentional discrimination. *Id.*

As to Buie's claim for FMLA retaliation, two provisions of the statute govern. Section 2615(a)(2) prohibits "discriminat[ion] against any individual for opposing any practice made unlawful by the subchapter"; § 2615(b) prohibits discrimination against any individual for instituting or participating in FMLA proceedings or inquiries. *See Bachelder v. America West Airlines, Inc.*, 259 F.3d 1112, 1124 (9th Cir. 2001). We evaluate a claim of FMLA retaliation the same way that we would evaluate a claim of retaliation under other employment statutes, such as the ADA or Title VII. *See King v. Preferred Technical Group*, 166 F.3d 887, 891 (7th Cir. 1999). Therefore, to prove retaliation, Buie may rely once again on the direct or indirect methods. The direct method is as described above for the ADA claim. The order of proof concerning retaliation under the indirect method, however, differs slightly. To establish a prima facie case, a plaintiff must

show that after [engaging in protected conduct] only he, and not any similarly situated employee who did not [engage in protected conduct], was subjected to an adverse employment action even though he was performing his job in a satisfactory manner. If the defendant presents no evidence in response, the plaintiff is entitled to summary judgment. If the defendant presents unrebutted evidence of a noninvidious reason for the adverse action, he is entitled to summary judgment. Otherwise there must be a trial.

*Rogers*, 320 F.3d at 754-55 (quoting *Stone v. City of Indianapolis*, 281 F.3d 640 (7th Cir. 2002)).[3]

### A. Evidentiary Issues

Before we assess whether, on the state of the record before the district court, a reasonable jury could have found Quad/Graphics liable for either claim, we must first address the parties' disagreement as to whether, as Buie asserts, the district court committed reversible error by refusing to consider parts of his affidavit on which he relied in response to Quad/Graphics' motion for summary judgment.

---

[3] Quad/Graphics incorrectly asserts that Buie must also prove a causal link between the protected activity and the adverse employment action. Although circuit precedent formerly required a causal link, *Stone*, which was decided under Circuit Rule 40(e), eliminated that requirement from the prima facie case of retaliation under the indirect method. *Rogers*, 320 F.3d at 755. The plaintiff in *Stone* brought claims under the ADA and Title VII, and not the FMLA. Nonetheless, as noted above, we assess a claim of FMLA retaliation in the same manner that we would evaluate a claim of retaliation under other employment statutes, such as the ADA or Title VII.

According to Buie, his affidavit provided evidence from which a reasonable jury could have concluded that Quad/Graphics' "reasons for imposing a disciplinary suspension and a 'Last Chance Agreement' on Mr. Buie were pretextual, and a jury could have found that the real reason [Quad/Graphics] imposed the discipline and the Last Chance Agreement was because Mr. Buie disclosed that he had AIDS." We review for an abuse of discretion the district court's decision to disregard parts of a plaintiff's affidavit. *Patterson v. Chicago Ass'n for Retarded Citizens*, 150 F.3d 719, 723 (7th Cir. 1998). For Buie to be entitled to relief, he must show both that the district court erred and that the exclusion of this evidence prejudiced his "substantial rights" under Federal Rule of Civil Procedure 61. *Rogers*, 320 F.3d at 751.

The district court excluded several parts of Buie's affidavit, citing *Albiero v. City of Kankakee*, 246 F.3d 927 (7th Cir. 2001), for the proposition that "self-serving affidavits are insufficient to defeat summary judgment." In *Albiero*, however, we held merely that self-serving statements contained in an affidavit will not defeat a motion for summary judgment *when those statements are "without factual support in the record." Id.* at 933 (emphasis added) (quoting *Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293, 1295 (7th Cir. 1993)); *see also Rogers*, 320 F.3d at 751 (construing *Albiero* as holding that "self-serving affidavits without factual support in the record do not create an issue of material fact"). In contrast, a self-serving affidavit supported by facts in the record could defeat summary judgment. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003). The record, moreover, may include the self-serving affidavit itself, provided that the affidavit "meets the usual requirements for evidence on summary judgment—including the requirements that it be based on personal knowledge and that it set forth specific facts showing that there was a genuine issue for trial." *Id. See*

*generally* 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2738 (3d ed. 1998).

We apply that standard to the three instances Buie specifies, in which the district court disregarded his affidavit. First is the district court's refusal to consider Buie's affidavit as evidence that Connell told Buie "not to come back to work at all until October 21, 1999," after Buie told him on October 15 that he had AIDS. Next is the district court's refusal to consider Buie's affidavit as evidence that the version of the altercation between Buie and Bridges as recounted by Bridges and several other employees was incorrect. Last is the district court's refusal to consider Buie's affidavit as evidence that he did not confront and threaten Grignon on December 1.

As to the latter two instances, both involved parts of the affidavit concerning events that occurred after Buie's suspension and the imposition of the last chance agreement. Neither, therefore, was relevant to proving that Quad/Graphics made those decisions for an impermissible reason. *See Sears, Roebuck & Co. v. NLRB*, 349 F.3d 493, 513, 515 (7th Cir. 2003) (reasoning that a decision cannot be motivated by what the decisionmaker does not yet know). Even if Buie's brief could be construed as arguing that those parts of the affidavit would have proven that Quad/Graphics fired Buie not for its professed reasons (his absenteeism and altercation with Grignon), but because he had AIDS and requested FMLA leave, there would still be no ground for relief. The points that Buie was trying to prove by introducing his affidavit, that he was not actually the aggressor in his confrontations with Bridges and Grignon, have nothing to do with his AIDS or the FMLA.

What matters is whether the decisionmakers who fired Buie honestly thought that Buie was culpable during the

two confrontations and whether that belief motivated his termination. *See Crim v. Board of Educ.*, 147 F.3d 535, 541 (7th Cir. 1998).[4] Even if such a belief were mistaken, which is all that the affidavit would tend to establish, it would still constitute a nondiscriminatory reason for the adverse employment action and would preclude Quad/Graphics' liability. *Id.* Moreover, even if the question of whether Buie confronted Grignon were relevant, that issue was answered explicitly by the Circuit Court of Waukesha County when it found that, not only did Buie approach Grignon, but that he got within six inches of her. This finding would estop Buie from contesting that fact unless the state court proceeding failed to provide minimum standards of due process, which Buie does not attempt to establish. *See Guenther v. Holmgreen*, 738 F.2d 879, 889 (7th Cir. 1984). Excluding the portion of Buie's affidavit covering his version of his confrontations with Bridges and Grignon was not an error, did not prejudice his substantial rights, and is not a basis for relief.

That leaves the exclusion of the part of Buie's affidavit offered to establish that, shortly after learning that Buie had AIDS on October 15, Connell told Buie "not to come back to work at all until October 21, 1999." He apparently wanted to show that on October 15 or 17,[5] when Connell learned

---

[4]  As we discuss below, Quad/Graphics cited Buie's confrontation with Grignon, but not his dispute with Bridges, as a nondiscriminatory reason for firing him.

[5]  Both Buie's opening brief and his affidavit are internally contradictory as to the date on which Connell ostensibly imposed what would become a disciplinary suspension. Each contains the assertion that the suspension began on October 15 *and* on October 17. Internally contradictory affidavits are generally disfavored.

(continued...)

that Buie had AIDS, he almost immediately imposed a suspension (a suspension that, Buie would later learn, was an unpaid, disciplinary suspension). If a jury believed that Connell acted almost immediately, it could (or so the theory goes) infer that Connell suspended Buie without pay simply because he had AIDS.

The district court disregarded this part of Buie's affidavit solely on the ground that self-serving affidavits are insufficient to defeat summary judgment. A self-serving affidavit should be considered, however, when it meets the requirements of evidence on summary judgment. *Payne*, 337 F.3d at 773. Buie's affidavit meets those criteria: it is based on his personal knowledge and sets forth that he was suspended shortly after revealing his disability, which is a specific fact relevant to whether his rights under the ADA and FMLA were violated (more about this later). *See* Fed. R. Civ. P. 56(e). Under these circumstances, the district court abused its discretion by refusing to consider this part of Buie's affidavit. *See Payne*, 337 F.3d at 773. We therefore must determine whether this evidentiary error prejudiced Buie's substantial rights. That is, we must ask whether this

---

(...continued)
*See Cooper Cameron Corp. v. Department of Labor*, 280 F.3d 539, 550 (5th Cir. 2002) (concluding that "[t]he government cannot meet its burden with an internally inconsistent, self-contradictory affidavit"); *cf. Piscione v. Ernst & Young, LLP*, 171 F.3d 527, 532 (7th Cir. 1999) (stating that an affidavit that contradicts earlier deposition testimony generally does not create an issue of material fact); *United States v. 1980 Red Ferrari*, 827 F.2d 477, 480 n.3 (9th Cir. 1987) (holding that internally contradictory deposition testimony created no issue of material fact). However, construed liberally, as discussed below, Buie's affidavit consistently supports the idea that his suspension followed shortly after he told Connell that he had AIDS.

claim, in conjunction with the evidence that the district court did properly consider, could have allowed a reasonable jury to rule in Buie's favor.

## B.   ADA Discrimination

Buie's theory of discrimination under the ADA is that, although he was a qualified employee, Quad/Graphics suspended him without pay, imposed a last chance agreement on him, and then fired him, because of what it regarded as his disability, AIDS. Before the district court, however, Buie did not argue that the imposition of a last chance agreement constituted an adverse employment action, and he has thus waived that argument on appeal. *Ehrhart v. Secretary of Health and Human Serv.*, 969 F.2d 534, 537 n.4 (7th Cir. 1992); *see also Hrobowski v. Worthington Steel Indus.*, 358 F.3d 473, 478 (7th Cir. 2004) (stating that "evidence not designated to the district court in resisting summary judgment cannot be properly argued on appeal"). We therefore confine our inquiry to whether a reasonable jury could conclude that Quad/Graphics suspended or discharged Buie because he had AIDS.

### 1.   Direct Method

We turn first to the direct method. As to the theories that Quad/Graphics violated the ADA by first suspending him without pay, and then discharging him, because he had AIDS, Buie put forth no direct evidence in support of either proposition. He did, however, present circumstantial evidence, namely the short time period between his suspension and the decision to fire him (they occurred on October 15 or 17 and December 1, respectively) and his announcement on October 15 that he had AIDS. In Buie's view, the timing of

these events was suspicious and would allow a jury to conclude that Quad/Graphics acted as it did because of Buie's disability.

Suspicious timing is a type of circumstantial evidence under the direct method. *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). However, a "temporal sequence analysis is not a magical formula which results in a finding of a discriminatory cause." *Foster v. Arthur Anderson, LLP*, 168 F.3d 1029, 1034 (7th Cir. 1999). By itself, temporal proximity would not normally create an issue of material fact as to causation, *see id.* (stating that "Foster would have to show more than just temporal proximity"), although it could suffice where the adverse action followed on the heels of the employer's discovery of the employee's disability, *cf. King*, 166 F.3d at 893 (reasoning that temporal proximity created an issue of fact where the plaintiff's termination occurred one day after she finished her FMLA leave).

Here, temporal proximity is all that Buie relies on under the direct method, and it does not create an issue of fact. Even when the record is viewed in Buie's favor, the undisputed evidence shows that he was on the brink of discharge before anybody at Quad/Graphics knew that he had AIDS. Connell warned Buie on September 9, 1999 that, if he continued "to have attendance problems" he could be fired. On September 24, October 10, and October 15, Buie nonetheless chose to miss work without excuse and without warning. It was only then, when Buie had every reason to believe that he was on the edge of termination, that he told Connell that he had AIDS. Quad/ Graphics had already experienced serious difficulties with Buie's continued problems with attendance. Also, after his disciplinary suspension, he had his aggressive encounter with, and made a threat toward, Grignon. All of these troubles occurred after Connell had already warned him that his job was in

jeopardy. It is also worth noting that, after Buie's AIDS announcement, Vrabel made a concerted effort to qualify Buie for pay under the FMLA for some of his absences where he had called in sick. And although Buie belatedly complains about a last chance agreement, it did give him another chance to perform satisfactorily despite his attitude and excessive absences. His response to that opportunity, in short order, was his confrontation with Grignon. (We put Buie's confrontation with Bridges aside because Quad/Graphics does not cite that incident as a reason for firing Buie.) Under these circumstances, we conclude that no reasonable jury could infer simply from the temporal proximity among Buie's announcement that he had AIDS (on October 15) and his subsequent suspension (on October 15 or 17) and the decision to fire him (on December 1) that Buie was suspended or fired because of his disability. An eleventh-hour declaration of disability does not insulate an unruly employee from the consequences of his misdeeds. We conclude that, under the direct method, Buie has not created an issue of material fact as to his ADA claim.

### 2. *Indirect Method*

The indirect method, as we discussed above, first requires Buie to establish a prima facie case, at which point Quad/Graphics must put forth a nondiscriminatory reason for its action, which then requires Buie to show by a preponderance of the evidence that Quad/Graphics' stated reason was a pretext for discrimination. The district court entered summary judgment for Quad/Graphics because Buie had not established prong two of the prima facie case and, in any event, Buie failed to rebut Quad/Graphics' nondiscriminatory reasons for suspending and then firing Buie. We affirm on the latter ground and need not reach the former.

Before the district court, Quad/Graphics justified the decision to impose a suspension on Buie on the ground that it was disciplinary action appropriate to his absenteeism. It explained the decision of Connell, Kirk, and Arndorfer to fire Buie on two grounds: that he was chronically absent without excuse or warning, and that he threatened Grignon. These reasons are nondiscriminatory, and thus, to avoid summary judgment, Buie had to put forth evidence that they were actually lies designed to camouflage that Quad/Graphics really acted against Buie because he had AIDS. The district court concluded that Buie had failed to produce such evidence.

On appeal, Buie maintains that he met his burden, pointing to evidence that several employees who did not have AIDS, out of the 11,000 or so employed by Quad/Graphics, had problems with attendance and threats but were not fired or suspended. Specifically, Buie claims that "since Sherita Rideout, Chris Studzinski, Bruce Iwanski, and Diane Grignon, all had attendance problems and they all engaged in violence or threats of violence in the workplace, it would have been reasonable for the District Court to infer that Quad/Graphics tolerated attendance problems in conjunction with violence and threats of violence in the workplace." According to Buie, a jury could infer from this disparity that Quad/Graphics' professed reasons for suspending and firing him actually were lies designed to conceal its real, invidious reasons for those actions.

The disparate treatment of similarly-situated employees who were involved in misconduct of comparable seriousness, but did not have a similar disability, could establish pretext. *Hiatt v. Rockwell Int'l Corp.*, 26 F.3d 761, 770 (7th Cir. 1994). As to Rideout, Studzinski, and Iwanski, however, Buie puts forth no evidence that they were disciplined by any of the same people who disciplined him, which means

that the discipline that they may (or may not) have received sheds no light on the decisions to suspend or terminate Buie. *See Timms v. Frank*, 953 F.2d 281, 287 (7th Cir. 1992) (reasoning that "it is difficult to say that the difference was more likely than not the result of intentional discrimination when two different decision-makers are involved"); *see also Smith v. Leggett Wire Co.*, 220 F.3d 752, 762 (6th Cir. 2000) (stating that the "comparisons are inapt, however, because Smith was disciplined by a different decisionmaker and engaged in different conduct than" the other employees); 1 Employment Discrimination, § 8.04 (Matthew Bender 2d. 2003) (stating that "it may be difficult or impossible to show intentional discrimination when more than one decisionmaker is involved").

That leaves the ostensible evidence of pretext arising from Quad/Graphics' treatment of Grignon's problems with attendance and threats. Grignon, like Buie, was supervised by Connell and (the briefs are unclear on this point) may have been supervised by Kirk and Arndorfer as well. However, Buie does not show that Grignon was treated differently for comparable misconduct. As to absenteeism, Buie maintains that "Grignon was absent fourteen times between 7/21/99 and 4/26/2000 (9 months), and she was disciplined for it on April 26, 2000." If true, this assertion would tend to show that Grignon was treated similarly for similar misconduct (although Buie's lack of specificity as to how Grignon was disciplined creates some ambiguity). Like Buie, Grignon was disciplined, but not fired, after Quad/Graphics concluded that she accumulated fourteen absences. Later, of course, Buie was fired—but not before he committed an act of disorderly conduct at work. Buie brazenly argues that he and Grignon were treated disparately because she was not also fired after engaging in a violent episode. However, the inflammatory incident for which Buie argues that Quad/Graphics should have fired

Grignon is the very one that, as the Circuit Court of Waukesha County found, Buie provoked by getting within six inches of Grignon, pointing in her face, and making threatening remarks. An employer's decision to punish the instigator of a violent, or nearly-violent, episode more severely than it treats his victim is evidence of rationality, not pretext. Buie has not rebutted Quad/Graphics' non-discriminatory reasons for first suspending and later discharging him.

We affirm summary judgment as to Buie's claim under the ADA because he fails to create an issue of material fact under either the direct or indirect methods.

### C. FMLA Retaliation

As discussed above, Buie may prove FMLA retaliation under the direct or indirect methods. Unfortunately, his brief as to this claim is difficult to decipher.

We begin with the direct method. Buie presents no direct evidence in support of this claim. The only circumstantial evidence to which he points is suspicious timing. Buie contends, as best we can discern, that the proximity between his announcement that he had AIDS (and, implicitly, Quad/Graphics' realization that Buie would request FMLA leave) and Buie's suspension and firing would allow a jury to infer retaliation. His suspicious timing argument regarding FMLA retaliation fails for the same reason it failed to prove ADA discrimination: given Buie's myriad problems at work, a reasonable jury could not conclude from timing alone that Quad/Graphics suspended or fired Buie because of his announcement that he had AIDS and, implicitly, because he would thus be requesting benefits under the FMLA.

Regarding the indirect method, for the same reasons discussed above in relation to the ADA claim, Buie fails to rebut the nondiscriminatory justifications that Quad/Graphics offered for his suspension and discharge. We conclude that summary judgment was proper as to Buie's claim for FMLA retaliation.

### III.

Although a self-serving affidavit may sometimes preclude summary judgment, in this case the district court properly refused to consider two parts of Buie's affidavit that were either irrelevant or unsupported by the record. It should have considered the portion of Buie's affidavit offered to show that Buie was suspended shortly after telling his boss that he had AIDS, but that failure did not prejudice Buie's substantial rights. Even in light of that evidence, we conclude that the record would not allow a reasonable jury to return a verdict in Buie's favor either as to his claim for ADA discrimination or his claim for FMLA retaliation.

AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*